USDC SCAN INDEX SHEET

















LLS   11/25/98   14:04
3:98-CV-02150   NIELSEN V. BROWNE
*1*
*CMP.*

Siderius Lonergan
500 Union Street, Ste 847
Seattle, WA  98101
206/624-2800
Ray Siderius WSBA 2944
C.R. Lonergan, Jr. WSBA 1267
Frank R. Siderius WSBA 7759
Attorneys for Plaintiff

In Association with:
Barry Adams, Cal. Bar No. 125474
1214 College Avenue
Santa Rosa, CA  95404
707/542-6644

FILED

98 NOV 25  PM 12: 03

CLERK. U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA (SAN DIEGO)

RAYMOND NIELSEN,

               Plaintiff,

   vs.

CHARLES BROWNE and SUSAN
BROWNE; PRIME ATLANTIC, INC.,
a Florida corporation; DAVID
L. HALSEY; BRACCUS GIAVANNO;
SOVEREIGN CAPITAL CORPORATION,
a Nevada corporation;
SOVEREIGN FINANCIAL
CORPORATION, a Wyoming
corporation,

             Defendants.

No. **98 cv 2150** TW JAH

COMPLAINT - CLASS ACTION

JURY DEMAND

Plaintiff alleges:

I.   JURISDICTION AND VENUE

    1.1  In this class action for damages and other relief, plaintiff makes claims under 15 USC §77l(a)(1) and 15 USC §77e (Section 12(a)(1) and §5 Securities Act of 1933, "the Securities Act"), 15 USC §78j(b) (Section 10(b) Securities Exchange Act of 1934, "the Exchange Act") as well as the rules and regulations

COMPLAINT - CLASS ACTION - 1

ORIGINAL

promulgated by the Securities and Exchange Commission under the Securities Act and the Exchange Act including SEC Regulation 10-b(5).

1.2  The subject matter jurisdiction over plaintiffs' claims is conferred upon this court by 15 USC §77v(a)(Section 22 of the Securities Act) and 15 USC §78aa (Section 27 of the Exchange Act). The acts and transactions constituting the violations occurred in this District.

1.3  Venue is proper in this District pursuant to 15 USC §77v(a) (Section 22 of the Securities Act) because the sale of the securities described in this complaint took place in this District and the defendants Browne are inhabitants of and transact business in this District.  Venue is also proper pursuant to 15 USC §78aa (Section 27 of the Exchange Act) because the acts and transactions constituting the violations alleged in this complaint occurred within this District.

1.4  The securities involved in this action were sold and issued to residents of different states.  Each defendant named in this action has directly or indirectly used the mails and/or means and instrumentalities of interstate commerce in connection with the wrongful conduct giving rise to plaintiff's claims.

## II.  PARTIES

2.1  Plaintiff Raymond Nielsen is a resident of Tukwila, King County, Washington.

2.2  Defendant Charles Browne is a resident of this District and is the President and Chief Executive Officer of Alliance Leasing Corporation (Alliance), a Nevada corporation which maintains its principal place of business at 750 B Street, Suite

COMPLAINT - CLASS ACTION - 2

1450, San Diego, California 92101.  He is President and Treasurer of defendant Sovereign Capital Corporation (Sovereign Capital). Upon information and belief plaintiff alleges that he is a "controlling person" of Sovereign Capital and defendant Sovereign Financial Corporation (Sovereign Financial) within the meaning of 15 USC §77o (Section 15 of the Securities Act).  He is also a "controlling person" within the meaning of 15 USC §78t (Section 20 of the Exchange Act) having actual power and influence over Alliance, Sovereign Capital and Sovereign Financial having and exercising actual power, influence and control over them.  The facts upon which the control of Sovereign Capital and Sovereign Financial are based are contained in Paragraph 12 of this complaint.

2.3  Defendant Susan Browne is a resident of this District and is, and was at all times material, Vice President of Sales of Alliance.  Upon information and belief plaintiff alleges that she is a "controlling person" of Sovereign Capital and Sovereign Financial within the meaning of 15 USC §77o (Section 15 of the Securities Act).  She is also a "controlling person" within the meaning of 15 USC §78t (Section 20 of the Exchange Act) having actual power and influence over Alliance, Sovereign Capital and Sovereign Financial, having and exercising actual power, influence and control over them.  The facts upon which the control of Sovereign Capital and Sovereign Financial are based are contained in Paragraph 12 of this complaint.

2.4  Prime Atlantic, Inc. (Prime Atlantic) is a Florida corporation, which has maintained offices and conducted business in Jacksonville, Ponte Vedra and Orlando, Florida.  The unregistered

COMPLAINT - CLASS ACTION - 3

securities sold to the plaintiff and the members of the class have been sold through Prime Atlantic pursuant to an exclusive Sales Agency Agreement dated November 1, 1997 which is titled, "Independent Sales Organization Agreement" (the ISO agreement). A copy is attached as Exhibit 1. By the terms of the ISO Agreement, Prime Atlantic was paid a thirty percent (30%) commission (described as a "selling fee") which was thirty percent (30%) of the purchase price of the securities issued by Alliance. Prime Atlantic, after becoming exclusive sales agent, actively solicited the sale of the securities issued by Alliance throughout the United States with sales to the plaintiff and to the members of the class. Prime Atlantic, in effecting such sales, was motivated by pecuniary interest in the sale. Prime Atlantic has acted as a "seller" of the securities within the meaning of 15 USC §77l(1) (Section 12 (1) of the Securities Act). Prime Atlantic was required to be registered as a broker-dealer with the Securities & Exchange Commission pursuant to 15 USC §78o(a) and (b) (Section 15 of the Exchange Act). Prime Atlantic is not now and has not been so registered.

2.5 David L. Halsey (Halsey) is a resident of Florida. He has at all times material been President of defendant Prime Atlantic, one of its two directors, and owner of fifty percent (50%) of its issued and outstanding stock. He had a pecuniary interest in selling the unregistered securities of Alliance and actively participated in the sales. He has been, continuously since November 1, 1997 a "controlling person" of that corporation under 15 USC §77o (Section 15 of the Securities Act) and 15 USC

§78t (Section 20 of the Exchange Act) having and exercising actual power, control and influence over Prime Atlantic.

2.6  Braccus Giavanno (Giavanno) is a resident of Florida.  He has, at all times material been an officer of defendant Prime Atlantic, Inc., one of its two directors, and owner of fifty percent (50%) of its issued and outstanding stock.  He had a pecuniary interest in selling the unregistered securities of Alliance and actively participated in the sales.  He has been, continuously since November 1, 1997, a "controlling person" of that corporation under 15 USC §77o (Section 15 of the Securities Act) and 15 USC §78t (Section 20 of the Exchange Act) having and exercising actual power, control and influence over Prime Atlantic.

2.7  Sovereign Capital is a Nevada corporation incorporated on March 14, 1997.

2.8  Sovereign Financial is a Wyoming corporation incorporated on August 19, 1997.

III.  SECURITIES INVOLVED

3.1  The investment scheme of Alliance and defendants Browne, its controlling persons, took two different forms, both involving a "security" as that term is defined in 15 USC §77b(a)(1) (Section 2(a)(1) of the Securities Act) and 15 USC §78c(a)(10) (Section 3(a)(10) of the Exchange Act).

3.2  During the period November 1, 1997 through approximately April 20, 1998, the investment was marketed with the use of a "Joint Venture Agreement" (the JV Agreement), representing the investment, a specimen copy of which is attached as Exhibit 2 to this complaint.  Since approximately April 20, 1998 the investment has been marketed with the use of an "Equipment Management

Agreement" (the EM Agreement), representing the investment.  Both the JV Agreement and the EM Agreement are "investment contracts" within the definition of "security" and the statutes in Paragraph 3.1.  Plaintiff Raymond Nielsen was furnished an EM Agreement dated August 4, 1998, a copy of which is attached as Exhibit 3.   The members of the class were each furnished either a JV Agreement or EM Agreement representing their investment.

(a)   The JV Agreement was a security which involved the investment of money in a common enterprise, expecting a profit solely from the efforts of others.   Under the JV Agreement, Paragraph 3, Alliance used its claimed expertise in selecting lessees, purchasing the equipment and evaluating the creditworthiness of proposed lessees.  (The promotional materials which Alliance and Brownes prepared and which were furnished to the plaintiff to induce him to invest describe that the leases are to "carefully selected, well-qualified businesses" and that Alliance possessed "impressive strength," (and) "management experience."  A copy of the promotional brochure furnished to the plaintiff is attached as Exhibit 4.)  Paragraph 5 of the JV Agreement provided that the investor would receive fifty percent (50%) of the net profits and  losses "or at a minimum, a 32% return on investment derived from the transactions after deduction from revenue received by the JV of an agent's fee of 10%."  Because of the sharing of profits and losses the fortunes of the investors were linked with those of the promoters.

(b)   The EM Agreement also constituted a security.  By the terms of the Agreement the profit was expected to come solely from the efforts of Alliance in selecting equipment to be leased

COMPLAINT - CLASS ACTION - 6

and selecting lessees for such equipment.  By the terms of the EM Agreement and the manner in which it was followed, neither the plaintiff nor any class member had control over such selections.[1] By the terms of Paragraph 4(h) of the EM Agreement, it was provided that Alliance had the power to "package" the leasing agreement of the plaintiff with other leasing agreements managed by Alliance and that the "packaged instruments" could be sold by Alliance to third parties.

Alliance possessed an interest in the investment that would rise or fall with the interest of the investor.  Paragraph 9 of the EM Agreement stated that the manager would receive "expenses of a transaction" a term not otherwise defined.   In accord with Paragraph 10, if the leased equipment became more valuable at time of termination of the lease than the amount owing to the investor, such excess would go to Alliance.  If, on the other hand, the lessee defaulted, or the leased equipment did not function or became obsolete, any value for Alliance in packaging the leasing agreement would be lost as well as the loss of any increase in value of the equipment at the end of the lease.

## IV.   CLASS ACTION ALLEGATIONS

4.1  In accord with FRCP 23 and Civ.L.R. 23.1, plaintiff alleges that this action is brought on behalf of the plaintiff and all other persons and entities similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure particularly 23(a)(1),

---

[1]   The EM Agreement is worded to imply that the investor has some type of control--but states in Paragraph 5 that the investor "**shall** approve, confirm or ratify..." the decisions.   (Emphasis supplied.)

(2), (3) and (4) and 23(b)(1) and (3).   The class which the plaintiff represents is composed of those persons, partnerships, limited liability companies, trusts, corporations and other entities who, during the period November 1, 1997 through November 25, 1998 invested in equipment leasing transaction(s) with: ALLIANCE LEASING CORPORATION, 750 B Street, Suite 1450, San Diego, CA 92101, and who received from Alliance Leasing Corporation either an Equipment Management Agreement or Joint Venture Agreement covering such investment.   The class is estimated to consist of 1,600 members nationwide.   These members are so numerous that joinder of all is impracticable.

4.2  The basis upon which the plaintiff claims to be adequate representative of the class is as follows:

(a)  There is no perceptible conflict of interest between plaintiff and any other member of the proposed class.   The plaintiff invested Two Hundred Thousand Dollars ($200,000.00) in the leasing program of Alliance and received on or about August 7, 1998 an executed EM Agreement which constituted a "security" within the definitions contained in 15 USC §77b(a)(1) and 15 USC §78c(a)(10).   Each member of the class similarly invested thousands of dollars in Alliance's equipment leasing program and received either a JV Agreement or an EM Agreement, both of which constituted unregistered securities.

(b)  The minimum investment in the Alliance leasing program was $10,000.   Plaintiff is one of the larger investors and is one of the five persons appointed in the bankruptcy of Alliance (United States Bankruptcy Court Southern District of California Case No. 98-14142-B11) to the Committee of Unsecured Creditors.

COMPLAINT - CLASS ACTION - 8

(c)   There are no acceptable alternatives to class action treatment of these claims.   The size of the class is too large to permit efficient handling of the claim on other than a class basis.

(d)   Plaintiff's counsel who bring this action are experienced in federal practice and are experienced in class action and securities class action fraud litigation.   Plaintiff's counsel have been certified as class counsel in securities fraud class action litigation in United States District Court for the Eastern and Western Districts of Washington and the United States District Court for the Southern District of Florida.   The litigation in the Eastern District of Washington involved a settlement paid to the class of over $7 million.   The litigation in the Southern District of Florida was tried to a jury with plaintiff's counsel serving as lead counsel.   The verdict for the class was $8 million.   While appeal was pending that litigation was settled for $8 million during 1997.   The appeal is reported at 85 Fed.3d 1508.

(e)   There are common questions of law and fact including the identity of the JV Agreements furnished to some class members and the EM Agreements furnished to other class members who invested in the Alliance leasing program, the fact that they constitute securities within the meaning of the Securities Laws, and the fact that the security was unregistered and without any prospectus furnished to the plaintiff or any other class member.

(f)   Class questions predominate in this litigation because (1) the cause of action brought on behalf of the plaintiff and the class is based upon the same securities issued, i.e., the JV Agreement and the EM Agreement; (2) there was a common course of conduct on the part of the defendants in marketing and selling to

COMPLAINT - CLASS ACTION - 9

the plaintiff and the members of the class the Alliance equipment
leasing program, and there are no overwhelming individual questions
involved.

(g)  Class action treatment is superior to individual
adjudication of claims and contributes to efficient judicial
management of these claims.

(h)  Other litigation that is pending concerning the
controversy includes the bankruptcy case of Alliance described in
Paragraph 4.2(b) above, and a Securities & Exchange Commission
application for injunctive and other relief pending in this court
in Civil Case No. 98CV 1810 JCGA, Securities & Exchange Commission,
Plaintiff, v. Alliance Leasing Corporation and Prime Atlantic, Inc.

(i)  To the best of the knowledge of plaintiff there are
no other pending cases related to this controversy.

4.3  There are no difficulties unique to the management of
this class action other than those necessarily involved in any
action on behalf of thousands of class members.  Fairness requires
certification of the class because prosecution of separate actions
by individual members of the class would create a risk of
adjudications with respect to the individual members of the class
which would, as a practical matter, be dispositive of the interests
of the other members not parties to the adjudication or would
substantially impair or impede their ability to protect those
interests.

4.4  Other than the amount expended by each individual
plaintiff for purchase of investment in the Alliance leasing
program, the claims of the plaintiff and the members of the class
are similar and plaintiff's claims are accordingly typical of the

COMPLAINT - CLASS ACTION - 10

1   claims of the members of the class.   There are common questions of

2   law and fact affecting the rights of the members of the class

3   including whether the investment program involved an unregistered

4   security and whether the defendants omitted to state material facts

5   necessary in order to make statements that were made in the light

6   of circumstances under which they were made not misleading.

## V.   CLASS DEFINED

7

8   The class which plaintiff requests this court to certify in

9   this action is composed of:

10      Those persons, partnerships, limited liability companies,
        trusts, corporations and other entities who, during the
11      period  November 1, 1997 to November 25, 1998 invested in
        equipment leasing transaction(s) with: Alliance Leasing
12      Corporation, 750 B Street, Suite 1450, San Diego, CA
        92101, and who received from Alliance Leasing Corporation
13      either an Equipment Management Agreement or Joint Venture
        Agreement covering such investment.

14

## VI.   FACTS

15

16   6.1  The allegations  contained  in  this  paragraph  and  in

17   Paragraphs 7 through 12 following are based upon investigation by

18   plaintiff's counsel, Ray Siderius, named on the first page of this

19   complaint,   the   exhibits   attached   to   this   complaint,   the

20   declarations and exhibits contained in United States District Court

21   Southern District of California Case No. 98-CV-1810JCGA, Securities

22   & Exchange Commission, Plaintiff v. Alliance Leasing Corporation

23   and Prime Atlantic, Inc. (the "SEC file"),  particularly  the

24   Declaration of Michael R. Wilner of November 9, 1998 and exhibits

25   attached thereto (the Wilner declaration) and the Declaration of

26   David L. Halsey (the Halsey declaration) dated October 29, 1998 and

27   exhibits attached thereto.   The allegations are also based upon

28   documents  contained  in  United  States  District  Court  Southern

COMPLAINT - CLASS ACTION - 11

1  District of California, Case No. 98-14142-B11, In Re Alliance
2  Leasing Corporation, a Nevada corporation, fdba Airlink Corporation
3  and Turbo Leasing Corporation, Debtor (the "bankruptcy file").
4  These allegations are made on information and belief of plaintiff
5  Raymond Nielsen and his counsel and to the best of their present
6  knowledge, information and belief the allegations are true and a
7  reasonable inquiry has been made under the circumstances.  In each
8  factual allegation in these paragraphs there appears, following the
9  allegation, a reference to the facts and/or the documents upon
10 which the belief is based.

11      6.2  This is a securities fraud involving investment by the
12 plaintiff and the class members of a total of just under $43
13 million. (Ex. 11, p. 19 to Declaration of Victor G. Ramsauer of
14 November 16, 1998 in the SEC file--the "Ramsauer declaration.")
15 Defendants Charles Browne and Susan Browne, while in control of
16 Alliance created and followed a scheme to defraud which involved
17 the following steps:

18      (a)  On November 1, 1997 the defendants Browne, on behalf
19 of Alliance and defendant Sovereign Financial entered the exclusive
20 sales agreement (the ISO agreement) engaging Prime Atlantic as
21 exclusive sales agent nationwide for the Alliance Leasing program.
22 (A copy of the ISO agreement is attached to this complaint as Ex.
23 1.   The reasons the agreement was executed on behalf of both
24 corporations are stated in the Halsey declaration at p. 2, ll. 23-
25 26.)

26      (b)  Alliance, through Prime Atlantic, advertised to life
27 insurance agents (and/or brokers and/or financial planners)
28 throughout the United States a "new alternative to financial

COMPLAINT - CLASS ACTION - 12

products" promising "strong returns" and "low risk."  One of these advertisements is appended to this complaint as Exhibit 5 which was placed in a life insurance agents' trade publication, "Life Insurance Selling," (8/98 issue).  The advertisement solicited life insurance agents, planners and brokers to market the program, stated that it provided a 28% return for proposed investors over a 25 month period[2], that the investors could rely on a "High Degree of Safety," that a $10,000 minimum investment was required and that the program would be managed by a "seasoned professional management team" and was backed by an "A-rated insurance company."  Alliance, through Prime Atlantic, promised the agents and financial planners and brokers a 10% commission for obtaining investors in the program, directing them for further information to call a company known as "Pioneer Financial Concepts" at 1-800-901-9805 (Ex. 5 to complaint).

(c)  Alliance Leasing Corporation and its controlling persons, defendants Browne, prepared a glossy advertising brochure of Alliance in which the following statements appear:

> Alliance Leasing is dedicated to operating this program based upon sound business practices, management integrity, and strategic financial planning...to maximize high return, minimize risk, and provide a viable opportunity for participants to realize their individual aspirations.
>
> As the emerging leader in the business of equipment leasing through venture participation, Alliance is uniquely poised to create a powerful and highly profitable position in the capital equipment field.

---

[2] Some of the investors were promised a 32% return over a 2-year period if they elected not to purchase lease insurance (Ramsauer declaration, p. 5, l. 11-14).

COMPLAINT - CLASS ACTION - 13

Alliance brings impressive strength, management experience and a niche advantage to the marketplace.

(The brochure itself is attached as Exhibit 4 to this complaint.  Its preparation by Alliance is supported by the Halsey declaration, p. 5, ll. 17-19.)

(d)  Those life insurance agents, brokers and planners who telephoned or otherwise responded to the ad described in Paragraph 6.2(b) requesting further information were mailed written materials prepared by Prime Atlantic which described the Prime Atlantic "network structure" consisting of sales contractors who collectively comprised the Prime Atlantic sales organization. These materials assured the sales contractors that with respect to any financial instrument product to be sold that Prime Atlantic had conducted or would conduct due diligence by stating:

(Prime Atlantic, Inc.) will conduct standard due diligence examinations of any prospective product, including where necessary, independent analysis by third party experts.  The economics, financial strength, history, management, prospects, track record and all risks will be explored.  Full disclosure of all material due diligence results will be incorporated in any product documents distributed to sales representatives.  All risks will be disclosed.

(This quote is from Exhibit 7, p. 43 to the Halsey declaration--Prime Atlantic's sales materials.  The hiring of Prime Atlantic as exclusive agent by the Brownes as controlling persons of both Alliance and Sovereign Financial is shown by Exhibit 1 to this complaint--the ISO agreement of November 1, 1997.)

(e)  The Prime Atlantic sales program was successful, raising almost $43 million from investors during the period November 1, 1997 until the Alliance Chapter 11 bankruptcy filing of October 8, 1998.  (Exhibit 11, p. 19 to Ramsauer declaration--

COMPLAINT - CLASS ACTION - 14

$42,909,053.57 in investor funds). The Prime Atlantic sales program was continuously controlled by defendants David L. Halsey and Braccus Giavanno who, at all times, continued as controlling persons of Prime Atlantic as alleged in Paragraphs 2.5 and 2.6 of this complaint. (Halsey declaration, p. 3, ll. 15-16.) Utilizing the JV Agreement from November 1, 1997 until approximately April 20, 1998, and the Equipment Management thereafter (Halsey declaration, p. 4, ll. 17-19), the class members invested with Alliance investment contracts the following sums (these sums are confirmed by defendant Susan Browne in Ex. 11, p. 19, Ramsauer declaration):

| | |
|---|---|
| December, 1997: | $   283,264.89 |
| January, 1998: | 826,590.17 |
| February, 1998: | 1,961,781.45 |
| March, 1998: | 2,126,265.22 |
| April, 1998: | 1,901,662.86 |
| May, 1998: | 3,339,185.48 |
| June, 1998: | 5,094,189.48 |
| July, 1998: | 7,323,916.14 |
| August, 1998: | 10,387,546.13 |
| September, 1998: | 9,664,651.75 |
| Total class investment: | $42,909,053.57 |

(f) Prime Atlantic obtained an attorney's opinion concerning the Alliance Leasing program dated November 24, 1997 from Andrew J. Yurcho. At the time Yurcho was an employee of Alliance. (Halsey declaration, p. 3, ll. 15-22; the opinion is Exhibit 2 to the Halsey declaration. Mr. Yurcho's employment with Alliance is based upon the statement of John Lang, a financial planner who was one of the "independent contractors" selling the security on behalf of Prime Atlantic. See Exhibit 6 to this complaint in which Lang describes Mr. Yurcho at p. 2 as "Alliance

COMPLAINT - CLASS ACTION - 15

1  corporate counsel."  The fact of Mr. Yurcho's employment with

2  Alliance was known to defendants Browne).

3        (g)  Defendants  Browne,  as  controlling  persons  of

4  Alliance then prepared and disseminated to Prime Atlantic initially

5  the JV Agreement which was utilized between November, 1997 and

6  April 20, 1998 and following April 20, 1998 the EM Agreement.

7  (Halsey declaration, p. 3, ll. 22-26, p. 4, ll. 17-19.) These

8  constituted the securities sold to the investors representing their

9  investment.  The EM Agreement is appended to this complaint as

10  Exhibit 3, a specimen copy of the JV Agreement is appended to this

11  complaint as Exhibit 2.  The JV Agreement is described in Exhibit

12  2 to the Halsey declaration.

13        (h)  The JV Agreement describes Alliance as the "agent"

14  in the opening paragraph and in Paragraph 5 states that the agent

15  will receive a fee of 10%.  The EM Agreement describes Alliance as

16  "manager" and in Paragraph 10 states that the manager for each

17  transaction shall receive a management fee equal to 10% of the

18  original  purchase  price  of  the  equipment  acquired  in  such

19  transaction.

20        VII. BRIEF DESCRIPTION OF SCHEME TO DEFRAUD

21      7.1  The controlling persons of Alliance, defendants Browne,

22  and also Prime and its controlling persons, Halsey and Giavanno,

23  continuously  and  repeatedly  from  and  after  November  1,  1997

24  presented this proposed investment to the investors by the brochure

25  as an investment in which all funds received from the investor,

26  with the exception of the 10% paid to Alliance, would be for

27  purchase by Alliance at fair market prices or lower, of quality

28  equipment to be leased to selected credit-worthy lessees in arms-

COMPLAINT - CLASS ACTION - 16

length lease transactions and that the lease proceeds would provide the income and return of principal to investors.

7.2  In reality, as demonstrated by the factual allegations in the next succeeding paragraphs (Paragraphs 8 through 12), considerably less than 90% of the original funds invested by the investor were used to purchase equipment.  Thirty percent (30%) of the invested funds were paid immediately to Prime Atlantic (ISO Agreement--Exhibit 1, p. 2, ¶ 4).  This commission was not disclosed to the investors.  That 30% undisclosed commission plus the 10% disclosed commission to Alliance meant that at the outset of the investment, merely 60% of the investor's funds were available to purchase equipment to be leased.  Further, with that 60% the defendants Browne, as controlling persons of Alliance, purchased some quality equipment at fair market prices, but misled the investors into believing that the true purchase price was more than twice what was actually paid.  Dummy invoices were used by the Brownes and Alliance to support such inflated purchase prices. Alliance then entered into leases with the lower priced equipment which leases were not arms-length transactions but instead were leases to the two defendant Sovereign corporations formed and controlled by the Brownes.  The amount of the monthly lease payments in these "Sovereign" leases was at a level that would have been appropriate if the true purchase price had been the inflated purchase price shown on the dummy invoices.  In reality, no arms length lessee would enter a lease and promise to pay such inflated lease payments if informed of the true original purchase price of the equipment.

COMPLAINT - CLASS ACTION - 17

7.3   Correspondence from Alliance to the investors carried out this deception.   Exhibits 7 and 8 to this complaint are two pieces of correspondence from Alliance to investor Wilma A. Mitchell who had invested $38,000.   She was told by Alliance in Exhibit 7 that her "participation amount" in the leasing program is $38,000.   In truth and in fact it is not possible to state honestly that any amount resembling $38,000 had been utilized by Alliance to purchase leased equipment on her behalf.   Ms. Mitchell was packaged by Alliance and Brownes with 28 other investors into a bundle of leases to form one lease with the controlled corporation Sovereign Financial as lessee.   The total "participation amount" of Ms. Mitchell and the 28 investors packaged with her amounted to $959,999.68.   After deducting the 10% disclosed commission to Alliance the amount available for purchase of equipment to lease was $864,000.00.   This meant that Ms. Mitchell's $38,000 investment constituted .04398% of the total package after payment of the 10% to Alliance.   The true purchase price of the equipment in this package lease was $342,900.00 (Ex. 9), meaning that the amount of Ms. Mitchell's investment actually used to purchase equipment on her behalf was $15,080.74.   This fraud was compounded by the Alliance letter to Ms. Mitchell describing Sovereign Financial as meeting "the criteria for acceptance as a lessee for your funds."   These allegations are supported by Exhibit 1 to the Wilner declaration describing Lease No. 9806058 in which the package lease to Sovereign Financial which included Ms. Mitchell's investment is itemized.   The true cost of the equipment, $342,900, is based upon Exhibit 6 of the Wilner declaration.   The dummy invoice (Ex. 10) showing a purchase price of the equipment

COMPLAINT - CLASS ACTION - 18

at$864,000 is Exhibit 6, p. 20 to the Wilner declaration.  The fact that this was typical handling by Alliance and the Brownes on leases to Sovereign Financial is based upon Paragraph 25, p. 7 of the Wilner declaration.  Further discovery will be necessary to determine that this was the practice followed by Sovereign Financial in all of the Sovereign Financial leases.

7.4  There were two other features to the scheme to defraud: (a) Alliance and its control persons transferred enough of the investor's funds to the Sovereign lessee so that the initial payments on the leases could be made to the investors.  (Wilner declaration, ¶22, p. 6.)  This meant that the investors were receiving a return of their own funds in a "Ponzi-like" scheme, and in addition (b) ten percent (10%) additional commissions were paid to the Sovereign corporations and their principals having the effect that the investor's original funds were used almost 50% in the payment of front commissions so that approximately 50% of those original investors' funds for the purchase of equipment to be leased (10% commission to Sovereign and its principals shown on Paragraph 5, ll. 17-18 of Wilner declaration).

## VIII.  OMISSIONS OF MATERIAL FACT

8.1  Defendants Browne, as controlling persons of Alliance, Sovereign Financial and Sovereign Capital, omitted material facts necessary in order to make statements and representations which were made to the plaintiff investor and the class members in the light of the circumstances under which they were made, not misleading.  These omissions of fact were all material, and would have been of material importance to any reasonable investor in deciding whether to invest in these securities:

COMPLAINT - CLASS ACTION - 19

(i) That from as early as the signing of the original ISO agreement on November 1, 1997, it was the plan and scheme of the Brownes to treat Alliance and Sovereign Financial as a single corporate entity--and that the intent at that time was to merge the two corporations. The plan and scheme was to enter leases with inflated purchase prices for the equipment leased to Sovereign Financial, a related and controlled corporation. (The ISO agreement is signed by defendant Susan Browne on behalf of both Alliance and Sovereign Financial.) The Halsey declaration at p. 2, ll. 22-24, states that Susan Browne describes Sovereign Financial as a "shell corporation" into which Alliance was to be merged.

(ii) There was no disclosure of the relationship between the Brownes and Sovereign Financial, nor that the intention of Alliance and Brownes from the beginning was to designate Sovereign Financial as lessee in the great majority of the Alliance leased transactions--an irreconcilable conflict of interest. (Ramsauer declaration p. 11, ll. 16-18). Sovereign Financial has been utilized as a lessee in over half of the Alliance leases. There was no disclosure that the Brownes had a plan as reported in the Halsey declaration, p. 2, ll. 23-27, to merge Alliance into Sovereign Financial. (The Ramsauer declaration at p. 11, l. 14 states that Sovereign Financial has entered $7,039,000 of leases with Alliance.)

(iii) There was no disclosure that a commission of 30% of initial investor's funds were to be paid to Prime Atlantic. (The ISO agreement, Ex. 1 to this complaint, Paragraph 4 provides that this 30% will be paid "within five working days" after the

COMPLAINT - CLASS ACTION - 20

1  investor has transferred the invested funds to Alliance and the
2  funds are deposited.)

3  　　　　　　　(iv) There was no disclosure that defendants Browne
4  had a history of securities disciplinary violations.  (Declaration
5  of Kathleen K. Bisaccia in SEC file, and Exhibit 1 to the
6  declaration, also Declaration of Timothy S. McCole at p. 4, Ex. 1,
7  Paragraph 6 in the SEC file.)

8  　　　　　　　(v)  There was no disclosure that the defendants
9  Browne, while controlling Alliance and both Sovereign corporations,
10 intended to lease equipment to the two Sovereign corporations that
11 they controlled and that the purchase price for the equipment was
12 less than half what was represented to the investors as the
13 purchase price.  (The control of the Brownes over the defendant
14 Sovereign corporations is detailed at Paragraph 12, *infra*.  The
15 fact that the purchase price for the equipment was less than half
16 what was represented to the investors is described in Paragraph 7.3
17 of this complaint.)  The excess funds from the difference between
18 the purchase price represented to the investors and the true
19 purchase price of the equipment were distributed to the Sovereign
20 corporations controlled by the Brownes.

21 　　　　　　　(vi) In addition to the 30% undisclosed commission
22 to Prime Atlantic and the disclosed commission of 10% to Alliance,
23 in leasing transactions entered into with the controlled
24 corporation Sovereign Financial, a commission of 10% was paid to
25 Sovereign Financial and its principals so that the ultimate result
26 after payment of all commissions was approximately 50% of the
27 investor funds available for purchase of equipment to be leased.
28

COMPLAINT - CLASS ACTION - 21

1

### IX.   ELEMENTS OF SCHEME TO DEFRAUD

2   9.1  Every omission of material fact alleged in the preceding
3   paragraph was in connection with a purchase of a security by
4   plaintiff Raymond Nielsen and the members of the class he
5   represents.

6   9.2  Every omission of material fact alleged in the preceding
7   paragraph was a substantial factor in the investment decision of
8   plaintiff Raymond Nielsen and in the investment decision of the
9   members of the class as reasonable persons in making a decision
10  whether to invest in the securities issued by Alliance.

11   ### X.   CAUSATION

12   The scheme to defraud perpetrated by defendants Browne,
13  Alliance and their controlled corporations Sovereign Financial and
14  Sovereign Capital caused the loss to the plaintiff and to the
15  members of the class.  The amount of the loss is not yet known
16  because of the pendency of the Chapter 11 bankruptcy of Alliance.
17  The assets reported to date in the bankruptcy proceeding are less
18  than half the amount of the investment by the plaintiff and the
19  members of the class.  This in part because of the transfer by
20  Alliance of more than $8 million to Prime Atlantic in the 30%
21  commission alleged in this complaint and the transfer by Alliance
22  of more than $7 million in lease transactions to the defendant
23  Sovereign corporations.  (The transfer of over $8 million to Prime
24  Atlantic is stated in Exhibit 11, p. 19 to the Ramsauer
25  declaration.   The transfer of over $7 million in leases to
26  Sovereign Financial is stated at p. 11, l. 14 of the Ramsauer
27  declaration.)

28

COMPLAINT - CLASS ACTION - 22

## XI.  RELIANCE

11.1 The securities offered by Alliance by the controlling persons, defendants Brownes, were so thoroughly tainted with fraud and so lacking in basic essentials, that such a security would not be marketable in the marketplace had the material omissions described in Paragraph 8 above been disclosed.  The securities which plaintiff and the class members purchased reached the market as a result of the scheme to defraud outlined in this complaint. Plaintiff and the class members relied upon an integrity of the market and were not aware of the fraud.  The defendants involved in the scheme to defraud knowingly conspired to bring securities to the market which were not entitled to be marketed.

## XII.  DEFENDANTS BROWNE -- SCIENTER -- CONTROLLING PERSONS OF SOVEREIGN FINANCIAL AND SOVEREIGN CAPITAL

12.1 Plaintiff alleges that both defendants Browne knew that the facts alleged in Paragraph 8 above were material to the investors and knew that they were not disclosed to the investors. Plaintiff alleges that each of the defendants Browne and defendant Sovereign  Financial and defendant Sovereign Capital committed manipulative and deceptive acts in furtherance of the scheme to defraud created and devised by Brownes outlined in Paragraph 7 above.

12.2 Plaintiff alleges that defendants Browne were controlling persons of both Sovereign Financial and Sovereign Capital.  This allegation is upon information and belief and is based upon the following facts and documents:

(a)   Susan Browne signed the ISO Agreement of November 1, 1997 on behalf of both Alliance and Sovereign Financial (Exhibit 1).

(b)   Charles Browne is president, secretary, and treasurer of Sovereign Capital (Declaration of Diana K. Tani of October 5, 1998 in SEC file--the "Tani declaration"; this statement appears at p. 3 of the Tani declaration, ll. 15-17).

(c)   Rolodex entries in the Alliance office list the address for both Sovereign Capital and Sovereign Financial at the Alliance address--750 "B" Street, 14th Floor, San Diego, California (Exhibit 4 to Tani declaration.)

(d)   This sharing of office space was confirmed by the statement of the FBI person referred to in the Tani declaration, p. 3, l. 24.

(e)   Alliance possessed files of Sovereign Capital and Sovereign Financial (Tani declaration, p. 4, ll. 1-3).

(f)   The signature designation on the Sovereign Financial Wells Fargo Bank Account No. 0802656082 is that of "Charles Browne--owner/principal."

(g)   Charles Browne had check signing authority for Sovereign Financial.  On numerous occasions he signed checks on behalf of Sovereign Financial.  Six of such checks written between December 10, 1997 and December 29, 1997, totaling $19,252, were made payable to Sovereign Capital, an entity in which the Brownes have admitted an ownership interest.  In fact, as to one Sovereign Financial account at Wells Fargo Bank, Mr. Browne appears to have been the only authorized signatory.  (SEC File--Response of the

COMPLAINT - CLASS ACTION - 24

Official Creditors' Committee[3]--Creditors' Committee Response, p. 3, ll. 25-28.)

      (h)  Sharon Oliver, an employee of Allied, had the authority to attest to Wells Fargo that Charles Browne was empowered to sign checks on behalf of Sovereign Financial.  Ms. Oliver was also indicated as the prospective Secretary and Director of Sovereign Financial in a draft version of a proposed prospectus for Sovereign Financial.  (Creditors' Committee Response, p. 4, ll. 5-9.)

      (i)  The draft version of the proposed prospectus for Sovereign Financial also states that Susan Browne's father, Wendell E. Graves, owned a controlling 81% interest in Sovereign Financial and was the Chairman of its Board of Directors as well as a Vice President.  (Creditors' Committee Response, p. 4, ll. 10-14.)

      (j)  A December 15, 1997 letter proposal from Albert F. Landwehr of Select Capital Markets, Inc. addressed to Susan and Charles Browne and Andrew Yurcho, indicates that Sovereign Financial was considering "going public"; 33.3% of the shares of Sovereign Financial were to go to Susan and Charles Browne; 33.3% were to go to Andrew Yurcho, and 33.3% to Select Capital Markets, Inc.  (Creditors' Committee Response, p. 4, ll. 14-19.)

      (k)  Susan Browne wrote numerous letters on Sovereign Financial letterhead.  (Creditors' Committee Response, p. 4, ll. 20-21.)

---

    [3] Response of the Official Creditors' Committee to Motion of the Securities and Exchange Commission for the Appointment of an Independent Chapter 11 Bankruptcy Trustee Over Debtor Alliance Leasing Corporation.

COMPLAINT - CLASS ACTION - 25

1          (1)   A request was made by Sharon Oliver to Symphony

2 Towers to change the signage for Sovereign Financial to add the

3 names Susan and Charles Browne.   (Creditors' Committee Response,

4 p. 4, ll. 22-24.)

5          (m)   Sovereign Financial made at least two payments

6 totaling $2,807.61 to Charles Browne via checks signed by Charles

7 Browne.   (Creditors' Committee Response, p. 4, ll. 25-26.)

8          (n)   Allied made a short term, apparently unsecured, loan

9 of $50,000 on June 29, 1998 to Sovereign Financial.   (Creditors'

10 Committee Response, p. 4, ll. 27-28.)

11          (o)   The Board of Directors minutes for Allied for August

12 30, 1997, indicate that Allied assisted with and funded the

13 formation of Sovereign Financial.   (Creditors' Committee Response,

14 p. 5, ll. 1-3.)

15

XIII.

**COUNT ONE AGAINST ALL DEFENDANTS OTHER THAN SOVEREIGN FINANCIAL**
16 **CORPORATION AND SOVEREIGN CAPITAL CORPORATION - STRICT LIABILITY -**
**SALE OF UNREGISTERED SECURITIES IN VIOLATION OF 15 USC §771(a)(1)**
17 **AND 15 USC §77e, SECTIONS 12 AND 5 OF THE SECURITIES ACT**

18    13.1 Plaintiff and the members of the class claim that the

19 securities described in this complaint were issued in violation of

20 15 USC §771(a)(1) and 15 USC §77e, Sections 12 and 5 of the

21 Securities Act.   There was no registration statement filed with the

22 Securities & Exchange Commission in effect with respect to these

23 securities.   The mails were used by each of the defendants to

24 deliver and sell the securities to the plaintiff and the members of

25 the class.   No prospectus was given to the plaintiff nor the class

26 members.

27    13.2 With respect to this allegation that plaintiff alleges:

28

COMPLAINT - CLASS ACTION - 26

(a)   Defendant Prime Atlantic participated in the sale of the unregistered securities motivated by a pecuniary interest, 30% commission on each sale as described in this complaint.   Prime Atlantic solicited the purchases from the members of the public and was a seller of the securities.

(b)   The issuer of the securities was Alliance.   The controlling persons of Alliance were defendants Browne who were motivated by a pecuniary interest in the sale of the securities and were sellers of the securities.

(c)   Defendants Halsey and Giavanno, who were control persons of Prime Atlantic, were motivated in the sale by a pecuniary interest, sharing in the 30% commission paid to Prime Atlantic of which defendant Halsey and defendant Giavanno each owned 50% interest.   Halsey and Giavanno were sellers of the securities.

(d)   Pursuant to 15 USC §77l(a)(2).   Those class members who have retained their securities may sue to recover the consideration paid upon tender of the securities.   Those class members who no longer own the security may sue for damages.

(e)   The statute of limitations for this count is contained in 15 USC §77m which is one year from the date of sale of the unregistered securities.   In this case, all of the purchases by the plaintiff and the members of the class occurred within the one year period prior to the filing of this complaint.

//

//

//

COMPLAINT - CLASS ACTION - 27

XIV.
COUNT TWO - SCHEME TO DEFRAUD - VIOLATION OF 15 USC §78j(b)
and SEC RULE 10b-5

THIS COUNT MADE AGAINST ALL DEFENDANTS OTHER THAN DEFENDANTS
PRIME ATLANTIC, INC., DAVID L. HALSEY AND BRACCUS GIAVANNO

14.1 The defendants Browne, by the scheme to defraud described in this complaint at Paragraphs 7 through 12 intended to deceive and intended to manipulate and defraud the plaintiff and the investing public, including the members of the class.  They created and devised this scheme to defraud, knowing that the plaintiff and the members of the class would be deceived by the material omissions of material fact described in Paragraph 8 above.  The plaintiff and the members of the class relied upon the representations contained in the sales brochures issued by the Brownes as controlling persons of Alliance and relied that a security so thoroughly tainted with fraud and so lacking in basic essentials that it would and should be unmarketable, could not be issued.  The plaintiff and each member of the class purchased the securities without knowledge or reason to believe of the facts contained in the material omissions described herein and the material omissions related to were in connection with the purchase of securities by the plaintiff and the members of the class.  The material omissions described in this complaint caused the loss to the plaintiff and the members of the class in amounts that are not at this time certain because it is not known at this time the amount of any recovery that may be received from the Chapter 11 bankruptcy of Alliance referred to in this complaint.

14.2 Based upon the decision in the United States Supreme Court in Lampf v. Gilbertson, 501 U.S. 350, 115 L.Ed.2d 321, 111

COMPLAINT - CLASS ACTION - 28

S.Ct. 2773 (1991), the statute of limitations for this count is one year. All of the purchases by the plaintiff and the members of the class occurred within the one year period prior to the filing of this complaint.

WHEREFORE, plaintiff prays as follows:

1. Plaintiff requests judgment against the defendants and each of them upon the causes of action alleged against them awarding to each plaintiff and to the members of the class damages to be established at time of trial, reasonable attorney's fees and such other and further relief as to the court may seem just.

## DEMAND FOR JURY TRIAL

2. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff hereby demands trial by jury of all issues.

Dated this ___25th___ day of November, 1998.

_____ WSBA 2944
Ray Siderius

_____ WSBA 1267
C.R. Lonergan, Jr.

_____ WSBA 7759
Frank R. Siderius
SIDERIUS LONERGAN
Attorneys for Plaintiff
500 Union Street, Ste 847
Seattle, WA  98101
206/624-2800

and

_____
Barry Adams   Cal. Bar No. 125474
Associate Counsel for Plaintiff
1214 College Avenue
Santa Rosa, CA  95404
707/542-6644

COMPLAINT - CLASS ACTION - 29

LIST OF EXHIBITS TO COMPLAINT

1.   Independent Sales Organization Agreement
     (the ISO Agreement). . . . . . . . . . . . .4, 12, 14, 17, 24

2.   Joint Venture Agreement (the JV Agreement) . . . . . . . .5, 16

3.   Equipment Management Agreement (the EM Agreement). . . .6, 16

4.   Alliance Leasing, Inc., Promotional brochure. . . . . .6, 14

5.   Advertisement, "Life Insurance Selling". . . . . . . . . .13

6.   Two page letter of John Lang dated February 26, 1998. . . .15

7.   Alliance correspondence to Investor
     Wilma A. Mitchell dated July 22, 1998 . . . . . . . . . .18

8.   Alliance corresondence to Investor
     Wilma A. Mitchell dated July 21, 1998 . . . . . . . . . 18

9.   Fair market purchase price of equipment
     on Alliance lease No.  9806058 . . . . . . . . . . . . . 18

10.  Dummy invoice for purchase of equipment
     on same Alliance lease No. 9806058. . . . . . . . . . . .18

LIST OF EXHIBITS

# Independent Sales Organization
### Agreement

November 1, 1997

Prime Atlantic, Inc.
526 Bryn Mawr St.
Orlando, FL 32804

Reference:  Alliance Leasing
Sovereign Financial Corporation
750 B Street, Suite 1450
San Diego, CA 92101

Gentlemen;

The Joint Venture ("J.V.") desires to raise capital by the sale of Units (the "Units") of J.V. interest in order to finance its business.

1. Program:  The J.V. has prepared the J.V. Program and absorbed the cost related to expenses.

2. Appointment of Independent Contractors:  On the basis of the representations, warranties and covenants herein contained and subject to the terms and conditions herein set forth, you are hereby appointed as the exclusive agent of the J.V. in connection with the private offering of the Units. You covenant to offer and sell Units on behalf of the J.V in accordance with the terms of this Agreement and the Memorandum, and not to misrepresent orally or in writing any of the facts regarding the J.V., its business, or the offering. You are not responsible for the contents or the Program or any other material supplied to you by J.V.  You covenant not to use any written material or oral statements in offering or selling the Units which are not specifically authorized by the J.V., provided, that you are specifically authorized to use the Program and related written offering materials supplied to you by the J.V.  Subject to the performance by the J.V.. of its obligations to be performed hereunder, and to the accuracy of all the representations and warranties contained herein, you hereby accept such agency and agree to perform your obligations hereunder.

3. Representation and Warranties of the J.V.  The J.V. warrants and agrees with you for your benefit that:

(a) The J.V. Agreement provides for the issuance and sale of Units. All action required to be taken by the J.V. as a condition to the issuance and sale of the Units has been taken.

1

EXHIBIT 1

(b) Prior to the admission of any joint venture partners into the J.V., the J.V. will be duly and validly organized, existing and in good standing as a joint venture partnership under the laws of the State of Nevada with full power and authority to conduct the business in which it is proposed to engage as described in the Program.

(c) From the commencement of the capitalization period through the termination of capitalization, the Program will not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(d) This I.S.O. Agreement has been duly and validly authorized, executed and delivered by or on behalf of the J.V. and constitutes the valid, binding and enforceable agreement of the J.V.

(e) No federal or state securities agency has issued an order preventing or suspending the Program or the use of the Program with respect to the sale of the Units. The J.V. will notify Prime Atlantic, Inc. promptly upon the issuance of any such order and furnish Prime Atlantic, Inc. with a copy thereof. The Program and any amendment or supplement thereto will comply and will continue with applicable requirements of the Securities Act of 1933, as amended (Section 2-1 for exempt securities) and any applicable federal and state laws and regulations at all times during the term of the Agreement.

(f) No consent, approval, authorization or other governmental authority is required in connection with the execution, delivery or performance by the J.V. of this Agreement, except as may be required under state securities laws.

(g) The execution and delivery of this I.S.O. Agreement will not constitute a breach of, or default under, any instrument by which the J.V. is bound or, to the best of their knowledge, any order, rule or regulation applicable to the J.V. of any court or any governmental body or administrative agency having jurisdiction over the J.V.

4. Compensation to Prime Atlantic Inc.: In consideration for your services hereunder, the J.V. covenants to pay to you a selling fee equal to 30% of the total purchase price of Units sold by the Partnership. Payment for fees is due to Prime Atlantic, Inc., within five (5) working days after bank has acknowledged deposit of funds and/or funds are indicated to be "good" and funds will be mailed in an expedient manner. This period shall apply to any and all funds that are not presented to the J.V. in the form of money orders, certified or cashier checks that are immediately negotiable.

2

EXHIBIT I

5. Covenants of the J.V.: The J.V. covenants with you that:

   (a) The term of this Agreement will commence on the date first above written and will terminate on the termination of the Program, unless sooner terminated by the written agreement of both parties herto.

   (b) The J.V. will provide you with the Program, the related offering material, and all amendments or supplements to the Program within a reasonable time after they are available. The J.V. will prepare the Program and related sales material during the capitalization of the Units at its sole expense. The J.V. covenants to amend, supplement and update the Program and related sales material during the capitalization of the Units in order to cause the Program and related sales material to contain true and accurate disclosure of all material facts regarding the J.V., its business, and the capitalization.

   (c) The J.V. will endeavor in good faith to assure the states where the Program will be offered recognizes exemptions for Securities under Section 2•1 of the Act of 1933 and the Units may be solicited in appropriate states. J.V. will provide a list of what states are legal.

   (d) The J.V. will not offer to sell Units in any state in which Program would be deemed unlawful.

   (e) The J.V. will make available financial reports in accordance with the J.V.

6. Payment of Expenses and Fees: You and the J.V. shall each pay their own expenses incident to the transactions contemplated by this I.S.O. Agreement. The J.V. shall bear all of its own fees and expenses incidental to the preparation of the Program.

7. Noncircumvention: The J.V. covenant not to directly or indirectly circumvent Prime Atlantic Inc. or any of its affiliates with respect to any partners introduced to J.V. as a direct or indirect result of this Agreement, without the prior written consent of Prime Atlantic Inc. In the event of a breach of this section by any party to this I.S.O Agreement, the other parties will have injunctive and equitable relief available, as well as all other remedies at law or in equity.

8. Conditions of Your Obligations: Your obligations hereunder are subject to the accuracy of and compliance with the representations and warranties of the J.V. and to the performance by the J.V. of its obligations hereunder.

3

EXHIBIT I

9. **Conditions of the Obligations of the J.V.:** The obligations of the J.V. hereunder are subject to the accuracy of and compliance with your representations and warranties and to the performance by you of your obligations hereunder.

10. **Indemnification:**

(a) The J.V. jointly and severally, indemnify and hold you, your affiliates, officers, directors, shareholders, independent contractors, employees, accountants and attorneys harmless of from and against all liabilities, claims, damages, losses, costs, attorney fees and expenses arising directly or indirectly out of the transactions herein contemplated as well as the Program herein contemplated, not the result of misconduct on the part of the Indemnified parties. In addition the J.V., jointly and severally, indemnify and hold you, your affiliates, officers, directors, shareholders, agents, employees, consultants and attorneys, and each of them harmless from and against any loss, expense, claim, damage or liability to which you or they may become subject, under any securities act or otherwise, inso far as such loss, expense, claim, damage, or liability or action in respect thereof, arises out of or is based in whole or part on any untrue statement of any material fact made by the J.V., or the omission thereby of any material fact required to be stated or necessary to make the statement made to a prospective partner not misleading. The J.V. shall promptly reimburse the Indemnified parties for any reasonable legal or other expenses incurred by it or them in connection with any such indemnified action or claim.

(b) In no case shall the J.V. be liable under this indemnity agreement with respect to any claim made against you or any such controlling person unless the J.V. in notified in writing (as Provided herein) of the nature of the claim within a reasonable time after the assertion theref, but failure so to notify the J.V. shall not relieve them from any liability which they may have otherwise than on account of this indemnity agreement. The J.V. shall be entitled to participate at their own expense in the defense or, if they so elect within a reasonable time after receipt of such notice, to assume the defense of such claims, which shall be conducted by counsel chose by them and reasonably satisfactory to you or the controlling person or persons, defendant or defendants in the suit, shall bear the fees and expenses of any additional counsel thereafter retained by you or them. The J.V. agrees to notify you within a reasonable amount of time of the assertion of any claim against them or any person, if any, who controls the J.V. in connection with the sale of the Units.

(c) You agree to indemnify and hold harmless the J.V. and all of their affiliates, officers, directors, shareholders, agents, employees, attorneys and accountants against any and all loss, liability, claim, damage and

4

EXHIBIT 1

12

expense whatsoever directly or indirectly resulting from violations by you or your representatives of any of your representations, warranties, or covenants in this I.S.O. Agreement, or of any law, rule or regulation. In case any action is brought against the J.V. or any of their affiliates under such laws, regulations or rules on account of such violation of such representatives, warranties or covenants, you shall have the rights and duties given to the J.V.

11. **Right of First Refusal:** The J.V. covenants to give Prime Atlantic Inc., the right of first refusal, for a period of 15 days after notifying Prime Atlantic Inc. in writing of the proposed Program, to be the exclusive sales agent on any future offerings sponsored by the J.V. for a period of three years after the date of this agreement.

12. **Representations, Warranties and Agreements to Survive Delivery:** All representations, warranties and agreements contained in this I.S.O. Agreement shall remain operative and in full force and effect, regardless of any investigation made by or on behalf of you or any person who controls you, or by or on behalf of the J.V. and shall survive the Sales Termination Date.

13. **Notices:** All communication herein shall be in writing and, if sent to you, shall be mailed, delivered or telegraphed and confirmed to you at the address first above written Attention: Braccus Giavanno and David L. Halsey.

14. **Parties:** This I.S.O. Agreement shall inure to the benefit of and be binding upon you, the J.V. and its respective successors and assigns.

15. **Entire Agreement:** This I.S.O. Agreement represents the entire agreement among the parties hereto and may not be amended except by a writing signed by the party against whom enforcement of the provision is sought. If the foregoing is in accordance with your understanding of our agreement, kindly sign and return to us a counterpart hereof, whereupon this agreement along with all counterparts will become a binding agreement among you, the J.V. in accordance with its terms.

Accepted by:                          Very Truly Yours,

_Buun Giaumo_                         By _Susan Browne_
**Braccus Giavanno**                  **Susan Browne**

_David L. Halsey_                     _V.P. of Sales_
**David L. Halsey**                   _CVM of Salton_ President

Attachment: Performance Agreement for Participating Partners.

5

13

**CONFIDENTIAL**

## JOINT VENTURE AGREEMENT

This Joint Venture Agreement (the " JV") is made and entered into this ___ day of ___; _____ 1998 by and between Alliance Leasing Corporation (the "Agent") and _____, the Joint Venturer (the "JVR").

## RECITALS

A. Alliance Leasing, the Agent, is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada.

B. _____ the JVR, is a corporation duly organized, validly existing and in good standing under the laws of the State of _____; or the JVR, is an individual(s) residing in the State of _____; or the JVR, is a Partnership residing in the State of _____

C. Both Agent and _____ desire to form this Joint Venture (the JV) pursuant to the terms and conditions of this Agreement to engage in a single or multiple equipment leasing transaction(s) (the "Transaction(s)").

D. Both the Agent and the JVR have experience or are familiar with the Transaction(s) pursuant to the Agreement.

NOW, THEREFORE, in consideration of mutual agreements, provisions and grants contained herein and for good and valuable consideration the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1. JV Formation.

The name of the JV to be utilized for the Transaction(s) contemplated hereby is _____
_____

2. JV Business Purpose.

The business purpose of the Agent and the JVR for the purposes of this JV shall be to enter into business (commercial) equipment leasing agreements with investment capital provided by the JVR to engage in a single or multiple transactions with a Lessee(s), the Transaction(s) to fulfill the need of business for business equipment to be supplied by leasing the equipment instead of purchasing the equipment.

3. Description of the Transaction(s).

The Agent shall enter into leasing agreements for business equipment purchased with the funds placed into the JV for purposes of the Transaction(s). Upon execution of the Leasing Agreement Documents and all ancillary Documents required of Lessee, between the Agent and the Lessee(s) and such other instruments of title as a Bill of Sale or Certificate of Title vested with the

Date:_____     Page 1 of 5 Pages     Initials:_____

Agent, Agent shall effect delivery of the equipment to the Lessee. Within ten (10) business days after consummation of the Transaction(s), a Uniform Commercial Code One Financing Statement will be filed with the State in which the equipment is located, in the office of the Recorder handling such transactions, evidencing the security interest in the Transaction(s) granted to the JV by the Agent. In addition to the business equipment utilized as the security for the lease, referred to herein as the Transaction(s), the Agent may require additional security including personal guarantees based on the creditworthiness of the Lessee, to secure the Transaction(s).

4. JVR Capital Investment to the JV.

In consideration of the formation of the capital investment of $_____ to the JV by the JVR, the Agent shall deposit the JVR's capital investment into a Alliance Leasing Corporation account at Wells Fargo Bank, an FDIC insured financial institution to engage in the Transaction(s) described herein pursuant to terms and conditions of the Agreement.

5. JVR Revenue Participation.

The JVR shall receive fifty (50%) percent of the net profits and losses, or at a minimum a thirty two (32%) return on Investment derived from the Transaction(s), after deduction from revenue received by the JV of an Agent's fee of 10%. All funds granted to the Agent are considered to be fees.

6. Management of JV.

On behalf of the JVR, the Agent shall manage the operations of the JV with responsibility for the supervision and administration of the Transaction(s); and shall have the authority to enter into, execute, fulfill and administer contracts or agreements of the JV, collect and disburse money, pay expenses pursuant to the obligations of the JV, including payments made to the JV pursuant to Section 5 hereinabove of the Agreement, "Revenue Participation", and perform all other duties and activities required hereby to carry out the purpose and intent of the Transaction(s).

7. JVR UCC-1 Filing Consent.

The JVR shall consent to, and the Agent shall obtain the release of the UCC-1 Financing Statement filing(s), or similar Document, made by the Agent on behalf of the JVR to secure the Transaction(s) upon payment of $_____ to JVR or payment of 100% of JVR's investment in the Transaction(s) pursuant to this Agreement.

8. Event of Default

In the event of a default in the payment of principal or interest with respect to the Transaction(s) by Agent, there shall be a forty-five (45) day grace period provision within which payment may be made before a declaration of default may be declared by the JVR. If the default is not cured within the forty-five (45) days, the JVR may declare the entire unpaid principal and accrued interest, if any, immediately due and payable. The Agent may cure a default at any time prior to the declaration of judgment by a court of competent jurisdiction.

Date:_____          Page 2 of 5 Pages          Initials:_____

NOV-16-1998  12:44        619 688 2473                                    P.44

CONFIDENTIAL

9. Obligations and Responsibilities of the JVR.

a. The JVR shall not be obligated to contribute additional capital to the JV, except upon terms mutually agreed upon in writing by both the JVR and Agent.

b. _____ _____ shall not have a fiduciary responsibility to the JV

10. Authority.

a. The Agent has the authority to execute, deliver and perform this Agreement which has been duly authorized by the Agent's Board of Directors. The consummation of the Transaction contemplated by this Agreement will not result in a breach of, or constitute a default under, or result in an acceleration of any obligation under, any agreement, indenture, lease, license, other instrument, law or order to which the Agent is a Party or by which it is bound.

b. If a Corporation _____ _____ has the authority to execute, deliver and perform this Agreement which has been duly authorized by the JVR's Board of Directors. The consummation of the Transaction contemplated by this Agreement will not result in a breach of, or constitute a default under, or result in an acceleration of any obligation under, any agreement, indenture, lease, license, other instrument, law or order to which the JVR is a Party or by which it is bound.

11. Notice.

All notices, requests, demands and other communications required or permitted to be given under this Agreement shall be in writing and shall be mailed to the party to whom notice is to be given, by first class mail, registered or certified, return receipt requested, postage prepaid, and properly addressed as duly given.

If to the Agent:                              If to JVR:

Alliance Leasing, Corporation
750 B Street, Suite 1450
San Diego, CA 92101

Any party, by giving written notice to the other party in the manner provided above, may change such party's address for purposes of this paragraph 11.

12. Damages Inadequate.

The parties to this Agreement acknowledge that it would be impossible to measure in money the damages to the other party if there is a failure to comply with any covenants and provisions of the Agreement, and agrees that in the event of any breach of any covenant or provision, the other party to this Agreement will not have an adequate remedy at law. Consequently, it is agreed that the party to this Agreement who is entitled to the benefit of the covenants and provisions of this Agreement which have been breached, in addition to any other rights or remedies which they may have, shall be entitled to immediate injunctive relief and/or specific performance to enforce such covenants and

Date:_____          Page 3 of 5 Pages          Initials. _____

P.45                                                      619 688 2473                    NOV-16-1998  12:44

CONFIDENTIAL

provisions, and that in the event that any such action or proceeding is brought in equity to enforce them, as the defaulting or breaching party will not urge a defense that there is an adequate remedy at law.

## 13. Arbitration.

In the event of such a conflict or default of either party to this Agreement, the parties agree that such shall be submitted to binding arbitration, with the losing party responsible for the costs incurred thereof and for any subsequent court action that may be required in the event of an award and collection of a judgment.

## 14. Waiver.

No failure or delay by either Agent or IVR to insist upon the strict performance of any term, condition, covenant or agreement of this Agreement, or to exercise any right, power or remedy hereunder or thereunder or consequent upon breach hereof shall constitute a waiver of any such term, condition, covenant, agreement, right, power or remedy or any such breach preclude either the Agent or the IVR from exercising any such right, power or remedy at any later time or times.

## 15. Modification.

No modification, amendment or waiver of any provision of this Agreement nor consent to any departure by either party therefrom shall in any event be effective unless the same shall be in writing and signed by both parties, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

## 16. Successors and Assigns.

This Agreement shall inure to the benefit of and be binding upon each of the parties, their respective heirs, legal representatives, successors in interest and assigns.

## 17. Attorney's Fees.

In the event that either party to this Agreement must resort to legal action in order to enforce the provisions of this Agreement or to defend such action, the prevailing party shall be entitled to receive reimbursement from the non prevailing party for all attorney's fees and all other costs incurred to commence, defend or enforce such action pursuant to this Agreement, including but not limited to post judgment costs.

## 18. Counterparts.
The Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

Date:_____          Page 4 of 5 Pages          Initials:_____

**CONFIDENTIAL**

19. Governing Law.

This Agreement shall be construed in accordance with the internal laws, and not the laws of conflicts, of the State of California applicable to agreements made and to be performed in such state: provided, however, that in the event of a legal action is brought by any party to this Agreement or by any party claiming benefit hereunder, said action shall be brought in a court having competent jurisdiction located within the County of San Diego, State of California.

20. Effect of Headings.

The titles or headings of the various paragraphs hereof are intended solely for the convenience of reference and are not intended and shall not be deemed to, modify, explain or place any construction upon any of the provisions of this Agreement.

21. Other Relationships.

The JVR hereby acknowledges and agrees that the Agent is not offering stock, equity or a limited partnership(s) as a part of this Agreement or any other relationship known or unknown that can be construed as a securities, as defined by the Securities & Exchange Commission.

22. Joint Venture Definition

The JVR hereby acknowledges and agrees that a Joint Venture is defined as an undertaking by two or more individuals or companies, for a specified period of time, used to share risk and utilize differences in expertise.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

"AGENT"                                      "JVR"
Alliance Leasing Corporation                 Name: _____
750 B Street, Suite 1450                            (Print or type name)
San Diego, CA 92101                          Address: _____
                                             City, State, Zip: _____
                                             Phone: _____
By: _____                              SSN _____

By: _____             By: _____
                                                  (JVR Signature)

Date: _____        Page 5 of 5 Pages        Initials: _G_ _D_ _B_

## EQUIPMENT MANAGEMENT AGREEMENT

THIS EQUIPMENT MANAGEMENT AGREEMENT (the "Agreement"), is made and entered into this _4_ day of _August_, 199_8_ by and between ALLIANCE LEASING CORPORATION (the "Manager" or "Agent"), and _Raymond Nielson_ (the "Principal").

### RECITALS

A.   Manager is engaged in the equipment leasing business directly and on behalf of other principals.

B.   Principal desires to retain Manager as Principal's agent to provide management services with respect to single or multiple equipment leasing transactions in accordance with the terms and conditions of this Agreement.

C.   Manager is willing to provide such services in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Principal and Manager agree as follows:

1.   Appointment.  Principal hereby appoints Manager and Manager hereby accepts the appointment, on the terms and conditions hereinafter provided, as management agent of purchase and equipment leasing transactions entered into by Principal or by Manager on Principal's behalf.  Principal and Manager acknowledge and agree that Manager is acting as agent for Principal on Principal's behalf and that Principal shall be the owner of all equipment purchased for lease as described herein and will be solely responsible for determining its use, regardless of whether any of such equipment is titled or held in Manager's name.

2.   Term.  This Agreement shall commence on the date of this Agreement, and shall thereafter continue until the earlier of 60 days after (a) the expiration of the Leasing Agreements as defined hereinbelow, or (b) the sale by Manager of all Leasing Agreements authorized pursuant to Section 4(h) hereinbelow.

3.   Capital Participation.  In consideration of this Equipment Management Agreement, Principal hereby instructs Manager to receive and deposit $_200,000_ ("capital funds") for the purpose of purchasing equipment to be leased.  These funds will be deposited into an Alliance Leasing special account at Merrill Lynch, a SIPC insured financial institution, to engage in the purchase and leasing transaction(s) described above.

4.   Services to be Provided by Manager.  Manager shall be responsible for the management and supervision of equipment acquisition and leasing transactions entered into by Principal or by Manager as agent for Principal (each, a "Transaction").  In connection therewith, Manager shall provide or cause to be provided the following services:

(a)   identifying and evaluating the financial condition, creditworthiness and other aspects of prospective lessees of equipment to be acquired by Principal or by Manager on behalf of Principal;

(b)   identifying and negotiating with sources and suppliers of equipment for the acquisition of equipment to be leased to third party lessees in a Transaction;

Revised June 23, 1998

(c)    entering into agreements to acquire and, with funds provided in advance by Principal, acquiring in Principal's name or in Manager's name on behalf and for the account of Principal equipment to be leased in a Transaction;

(d)    negotiating the terms and conditions of and entering into Leasing Agreements with third party lessee(s) for the lease of equipment;

(e)    performing such administrative, managerial or other functions and obligations of Manager or Principal as may be necessary in connection with a Transaction whether pursuant to a Leasing Agreement or otherwise, including, but not limited to, delivering equipment to lessee(s) under Leasing Agreement(s), filing UCC-1 Financing Statements in such jurisdictions as Manager deems appropriate in connection with a Transaction, receiving and accounting for payments from lessee(s) under the Leasing Agreement(s) and disbursing payments to Principal therefrom (after deducting any fees or other compensation due to Manager hereunder);

(f)    monitoring the compliance by lessee(s) under Leasing Agreement(s) and enforcing the terms and conditions thereof;

(g)    maintaining adequate records and accounts of all income and expenditures related to each Transaction;

(h)    negotiating and entering into transactions for the packaging of Leasing Agreements with other leasing agreements which Manager manages and the selling of such packaged instruments to third parties;

(i)    assisting with the disposition of equipment following the expiration or earlier termination of a Leasing Agreement; and

(j)    such other duties or responsibilities as may be agreed upon by Manager from time to time.

Manager shall be entitled to retain or engage such persons or entities as Manager determines to perform any or all of the foregoing services on behalf of Manager.

5.    <u>Authority of Manager</u>.  Manager shall have no authority to enter into Transactions or any contract, agreement, document or instrument related thereto or to a Leasing Agreement, without the express written approval of Principal.  Accordingly, Principal shall approve, confirm or ratify in writing the vendor from whom equipment is purchased, the terms of the purchase of the equipment, each proposed lessee under a Leasing Agreement, including the financial condition of such lessee, the terms of each Leasing Agreement, and the terms of the sale of Leasing Agreements as authorized in Section 4(h) hereinabove.

6.    <u>Collection of Rental Payments; Etc.</u>  Manager shall collect or cause the collection of all rental payments and other charges due from lessee(s).  Principal authorizes Manager to take any action which Principal would be permitted to take under the terms of any Leasing Agreement and otherwise, including, but not limited to: (a) requesting, demanding, collecting, receiving and receipting for all rent and other charges; (b) instituting legal proceedings in the name of Principal for the collection thereof; (c) repossessing and retaking equipment from lessee(s) and reletting such equipment to other lessee(s); (d) settling and compromising any legal proceedings; and (e) incurring collection fees, costs and legal fees necessary or incidental thereto.

Revised June 12, 1996

-2-

7. **Insurance:** Royal Indemnity Company, as evidenced by Addendum attached herein, has insured the Equipment Purchase Program of Alliance Leasing in the amounts described in said Addendum.

8. **Yield:** In addition to return of purchase price, Manager shall return a yield to Principal from funds collected in the amount of twenty-eight percent (28%) paid over a twenty-five (25) month period.

9. **Disbursements.** Manager shall, from the funds collected, be entitled to receive: (a) Manager's compensation due hereunder, and (b) amounts otherwise due and payable as expenses of a Transaction including but not limited to advances of commissions. In connection therewith, Principal acknowledges that Manager has engaged an automated clearing company which will provide payment collection and disbursement operations in connection with Transactions and this Agreement (the "Clearinghouse"). Such Clearinghouse shall receive all lease payments due under Leasing Agreement(s), pay to Manager its compensation and any other sums due hereunder, and disburse to Principal all remaining amounts.

10. **Management Fee.** As a fee for the services to be provided by Manager hereunder, Principal shall pay to Manager for each Transaction a management fee equal to 10% of the original purchase price of the equipment acquired in such Transaction (payable at the time the equipment is purchased), and thereafter upon disposition or termination of the lease, any amounts left after the return of Principal's purchase price and the return stated in paragraph eight above.

11. **Assignment.** Without the prior written consent of the other party, neither party shall have the right to assign, transfer, or convey any of its right, title, or interest in this Agreement, which consents will not be unreasonably withheld. Notwithstanding the foregoing, Manager shall be entitled to delegate to a third party, including an affiliate, any or all of the obligations or duties required to be kept or performed by it hereunder.

12. **No Partnership, Joint Venture.** Nothing contained in this Agreement shall be deemed or construed to create a partnership or joint venture between Principal and Manager or to cause Manager to be responsible in any way for the debts and obligations of Principal or any other party. Likewise Principal shall not be liable for the debts and obligations of Manager. It is the intention of the parties that the only relationship hereunder is that of agent and principal, and Manager shall not represent to anyone that its relationship to Principal by virtue of this Agreement is other than the foregoing.

13. **Parties Bound.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns except as expressly provided herein. Nothing in this Agreement nor any service, duty, relationship or other matter referred to herein are intended for the benefit of any person not a party to this Agreement.

14. **Notices.** All notices, demands, consents, approvals and requests given by either party hereunder shall be deemed to have been duly given under this Agreement, only if given in writing, and either (a) upon receipt if hand delivered by a party or delivery service or (b) if mailed, on the third (3rd) business day after sent by United States registered or certified mail, postage prepaid, to the parties at the following addresses:

If to Manager:                   ALLIANCE LEASING CORPORATION
                                750 B Street, Suite 1450
                                San Diego, California 92101
                                Attention: Sharon Oliver

Revised July 13, 1996

–3–

If to Principal:    *Roy Novel Pleurin*
                    *5108 So. 163rd Pl*
                    *Seable, Wn, 98188*

Either party may at any time change its respective address by sending written notice to the other party of the change in the manner hereinabove described.

15.   **Governing Law.**  This Agreement shall be construed under and in accordance with the laws of the state of California.

16.   **Jurisdiction.**  Each party hereto agrees to submit to the personal jurisdiction and venue of the state and federal courts in the state of California in the judicial circuit of San Diego County, and does hereby waive all questions of personal jurisdiction and venue, including, without limitation, the claim or defense that such courts constitute an inconvenient forum.

17.   **Legal Construction; Modification.**  If any provision of this Agreement shall be held invalid or unenforceable, such provision shall be deemed to be modified to the minimum extent necessary to make it valid and enforceable, and the validity and enforceability of the remainder of this Agreement shall not be affected thereby.  This Agreement may not be modified or amended, nor may any provision contained herein be waived, except in writing signed by all parties, or if such modification, amendment or waiver is for the benefit of one of the parties hereto and to the detriment of the other, then the same must be in writing signed by the party to whose detriment the modification, amendment or waiver inures.

18.   **Waiver.**  One or more waivers of any covenant, term or condition of this Agreement by either party shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition.

19.   **Counterparts.**  This Agreement and all other copies of the Agreement, insofar as they relate to the rights, duties and remedies of the parties, shall be deemed to be one agreement.  This Agreement may be executed concurrently in one or more counterparts, each of which, including a signed, facsimile copy hereof, shall be deemed to be an original, but all of which shall together constitute one and the same instrument.

20.   **Costs of Enforcement.**  In the event any party hereto initiates action to enforce its rights hereunder or to interpret the terms hereof, the substantially prevailing party shall recover from the substantially non-prevailing party its reasonable expenses, court costs, including taxed and untaxed costs, and reasonable attorneys' fees (including fees of paralegals and legal assistants), whether suit be brought or not (collectively referred to as "Expenses").  As used herein, Expenses include Expenses incurred in any appellate or bankruptcy proceeding.  All such Expenses shall bear interest at the highest rate allowable under the laws of the State of California from the date the substantially prevailing party pays such Expenses until the date the substantially non-prevailing party repays such Expenses.  Expenses incurred in enforcing this Section shall be covered by this Section.  For this purpose, the court is requested by the parties to award actual costs and attorneys' fees incurred by the substantially prevailing party, it being the intention of the parties that the substantially prevailing party be completely reimbursed for all such costs and fees.  The parties request that inquiry by the court as to the fees and costs shall be limited to a review of whether the fees charged and hourly rates for such fees are consistent with the fees and hourly rates routinely charged by the attorneys for the substantially prevailing party.

Revised form 13, 1998

21.    Captions and Paragraph Headings. Captions and paragraph heading contained in this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or content of this Agreement nor the intent of any provision hereof.

22.    Survivability of Obligation - The terms and conditions of this Agreement shall be binding against all successors, agents, heirs and assigns of lessee, and the rights of lessor shall not be limited in any fashion by a change in the legal status of lessee.

23.    Entire Agreement; Prior Agreements Superseded. This Agreement constitutes the sole and entire agreement of the parties hereto and supersedes any prior understandings or written or oral agreements between the parties respecting the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto have set their hands and seal as of the date first written above.

"MANAGER"
Alliance Leasing
750 B Street, Suite 1450
San Diego, CA 92101

"PRINCIPAL"

Name: _Raymond Nielson_
(Print or type name)

Address: _5108 So. 163rd Pl_

City, State, Zip: _Seattle, Wa. 98188_

Phone: _206-243-6327_

SSN: _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_

By: _John L. McDonald_

Title: _President_

By: _(signature)_
(Principal Signature)

## FOR IRA PARTICIPANTS ONLY: ACCEPTANCE OF NEW CUSTODIAN

We agree to accept custodianship for the IRA established on behalf of the above named individual. We further accept this appointment as successor custodian of this IRA account _____, as custodian for the IRA of _____

Dated: _____        By: _____
                                              Custodian

Address: _____

# ACORD. EVIDENCE OF PROPERTY INSURANCE

THIS IS EVIDENCE THAT INSURANCE AS IDENTIFIED BELOW HAS BEEN ISSUED, IS IN FORCE, AND CONVEYS ALL THE RIGHTS AND PRIVILEGES AFFORDED UNDER THE POLICY.

| PRODUCER | PHONE (A/C, No, Ext): 334-867-8081 | COMPANY |
|---|---|---|
| Escambia Insurance Agency, Inc. P. O. Box 409 Brewton        AL    36427 | | Royal Indemnity Company Charlotte        NC    28201 |

| CODE: | SUB CODE: |
|---|---|

AGENCY CUSTOMER ID #:

| INSURED | | | |
|---|---|---|---|
| Alliance Leasing 750 B Street, Suite 1450 San Diego        CA    92101 619-234-1381 | | | |

| LOAN NUMBER | POLICY NUMBER |
|---|---|
| | B061698 |
| EFFECTIVE DATE | EXPIRATION DATE | |
| 06/16/98 | | [X] CONTINUED UNTIL TERMINATED IF CHECKED |

THIS REPLACES PRIOR EVIDENCE DATED:

## PROPERTY INFORMATION

LOCATION/DESCRIPTION

Various in the United States                    Leased Equipment & Lease Payments

## COVERAGE INFORMATION

| COVERAGE/PERILS/FORMS | | AMOUNT OF INSURANCE | DEDUCTIBLE |
|---|---|---|---|
| Section A: Lease Default Coverage | Manuscript | ** | ** |
| Section B: Contingent Physical Damage Cov. | CP1030 (6/95)-Special Form | ** | ** |

## REMARKS (Including Special Conditions)

**Amount of Insurance
$1,000,000 Any One Lease
$2,000,000 Any One Lessee
$25,000,000 Any One Loss; Sublimit of $5,000,000 for Flood and Earthquake

Premium Rate: 4% including taxes & fees

**Deductible
Default: Three (3) monthly lease payments
Contingent Physical Damage: $5,000 per lease for all perils except Flood and Earthquake which are subject to a deductible of 5% of the value with a minimum deductible of $50,000.

## CANCELLATION

THE POLICY IS SUBJECT TO THE PREMIUMS, FORMS, AND RULES IN EFFECT FOR EACH POLICY PERIOD. SHOULD THE POLICY BE TERMINATED, THE COMPANY WILL GIVE THE ADDITIONAL INTEREST IDENTIFIED BELOW __10__ DAYS WRITTEN NOTICE, AND WILL SEND NOTIFICATION OF ANY CHANGES TO THE POLICY THAT WOULD AFFECT THAT INTEREST, IN ACCORDANCE WITH THE POLICY PROVISIONS OR AS REQUIRED BY LAW.

## ADDITIONAL INTEREST

| NAME AND ADDRESS | | |
|---|---|---|
| None Stated | MORTGAGEE        ADDITIONAL INSURED LOSS PAYEE LOAN # | |

| AUTHORIZED REPRESENTATIVE |
|---|
| W.H.? Cooper |

ACORD 27 (3/93)                                        © ACORD CORPORATION 1993



*Nothing, not even sheer ability, can make up for the dedication required for building a successful business.*

—RAY EPPERT

ALLIANCE
LEASING

*Enthusiasm is at the bottom of all progress. With it there is accomplishment. Without it there are only alibis.*

—HENRY FORD

*To succeed, one must possess an effective combination of ability, ambition, courage, drive, hard work, integrity, and loyalty.*

—HARRY BANKS



*Alliance Leasing is committed to leadership in the corporate leasing environment through its unique Equipment Purchase Program. Within the fiscal and management parameters of the organization, promising and credit-worthy businesses are funded through venture participation by the private sector. Alliance Leasing is dedicated to operating this program based upon sound business practices, management integrity, and strategic financial planning . . . to maximize high return, minimize risk, and provide a viable opportunity for participants to realize their individual financial aspirations.*



*The first mark of a good business is the ability to deliver its product or service on time and in the condition which the client was led to expect.*

—J.T. FERGUSON

*An effective leader has two important characteristics. First, he is going somewhere; second, he is able to persuade other people to go with him.*

—MAXIMILLIAN
FRANCOIS ROBESPIERRE

*Quality of management is all-important. After all, what is a company but people. If the people have character, imagination, and drive, that's good enough for me.*

—DONALD A.
HERMAN

*A successful business is built upon strong qualities . . . the sacrifice, endeavor, loyalty, integrity of its management and employees.*

—GRANT D.



*Your success depends on you. You have to steer your own course. You must make your own decisions. You have to build your own monument.*

—B.C. FORBES

## ALLIANCE. . . WITH AMERICAN BUSINESS AND THE AMERICAN DREAM.

*In 1994, Alliance Leasing was formed as a Nevada corporation specializing in the $140-billion-dollar equipment leasing industry. However, leasing is but one prong of the company's financial activities. Additionally, Alliance offers venture participation through its unique "Equipment Purchase Program."*

The focus of the business is two-pronged. The first places leased equipment into well-positioned, strongly-niched businesses, typically with less than a 5-year operating history. The second forges a financial association with individuals in the private sector who are interested in earning high return for their retirement and/or savings packages.

### ALLIANCE... WITH A STRONG BUSINESS STRATEGY

With diminishing corporate tax benefits for depreciation expense, companies who qualify for the Alliance Leasing program enjoy the advantages of:

- Financing their operations through a leasing format, thereby allowing corporate assets to be held otherwise directed;

- Budgeting for much-needed equipment through a regularly scheduled payment plan, often extended over the life of the equipment.

- Allocating lease payments as expense items for accounting

Virtually any equipment is qualified for the program. For example, Alliance might be asked to provide telephone systems and computer equipment for the business sector; kitchen furnishings for food service organizations; medical technology for the health care industry; or any number of myriad business concerns.

### ALLIANCE... IN THE SPIRIT OF COOPERATION.

For those with the desire to accelerate their financial goals through increased yields, Alliance Leasing provides a strong offering. It allows participants to work through Alliance in the purchase of equipment, which is, in turn, leased to carefully selected, well-qualified businesses. The offering includes a 16 percent return for two consecutive years, with a complete buy-out at, or before, the end of that period.

Business research clearly demonstrates that the equipment leasing business provides an excellent area for financial participation. In their report, the U.S. Department of Commerce verifies that 80 percent of American companies



*Business is founded on vision and confidence; success on industry and cooperation.*

—JOHN HENRY PATTERSON

strategy as a means of retaining capital for investment, inventory purchases, or other purposes.

In fact, the equipment leasing industry is marked by explosive growth... over 34 percent during the last decade. And, the forecast is for continued phenomenal growth, as tax structuring continues to demonstrate the wisdom for businesses to maintain more capital liquidity.

## ALLIANCE... TO MAXIMIZE THE GREAT POTENTIAL OF A GOOD IDEA.

As the emerging leader in the business of equipment leasing through venture participation, Alliance is uniquely poised to create a powerful and highly profitable position in the capital equipment field. For corporate clients and private-sector participants alike, Alliance brings impressive strength, management experience, and a niche advantage to the marketplace.

As one of the first companies to specialize in growth companies, Alliance is capitalizing on a rapidly growing and economically strong business environment.

The market is relatively untapped and unchallenged, with conventional lenders preferring to fund long-established businesses, with financing over a longer term, and a lower return on investments.

By creating lease agreements at greater than standard interest rates, generally over a shorter term, Alliance is supporting the entrepreneurial environment on which the strong American economy was originally built. Thus, we are offering newer businesses the opportunity and financial resources to establish and grow. At the same time, Alliance offers venture participants impressive yields and very high certainty-of-return stability.

Though certainly, Alliance acknowledges some degree of speculation in its program, we believe that it is strongly mitigated by the fact that Alliance and the participating venturers:

- Own the leased assets, which can be retrieved in the highly unlikely event of default on the lease (See detailed description of Uniform Commercial Code compliance, located in the back pocket of this brochure);

- Hold a lease agreement, not
only guaranteed by the lessee

corporation, but also with the personal guarantee of the business owner.

## ALLIANCE... WITH A PROGRAM THAT WORKS FROM A PERCENTAGES POINT OF VIEW.

The goal of any financial participant in a business venture is to put his or her assets to work in the most advantageous way possible. Alliance prides itself on the ability to withstand the intense scrutiny of those who have this goal.

Once the funds have been cleared, participants can expect the payment stream on their funding to begin within a maximum of 30 days. Payments continue each month for a total of 25 months. (Review "Schedule of Payments" in the back pocket of this brochure.)

In order to locate and qualify the most desirable lessee companies for funding, Alliance has created a fully implemented marketing and public relations program. The Company is also building a multi-million-dollar portfolio in order to ensure ongoing efforts designed to build and maintain corporate awareness



*Whenever you discover a successful business, it's because someone made a courageous decision, beginning with dedication and an investment of time and money.*

## ALLIANCE...WITH THE ENTREPRENEURIAL SPIRIT.

*The Alliance "Equipment Purchase Program" is an exceptional idea for venture funders and young, promising companies alike. The strength of the program is a reflection of the entrepreneurial spirit which has guided the American way of business since the beginning.*

It is a reflection of progress, creative insight, financial strategy, and unparalleled vision. It is an opportunity for businesses to grow and prosper. It is an opportunity for venture participants to achieve their financial goals and objectives.

It provides American business with what it needs to reach the pinnacle of success. It also provides Americans from all walks of life a share in the energy and vitality of American business. From every perspective, it is a winning idea for everyone who wants to participate fully in realizing the American dream.



# Introducing

## A New Alternative to Financial Products!

● *Strong Returns* ●   ● *Low Risk* ●



# 28%
## *TOTAL RETURN*



### Backed by A.M. Best "A" Rated Ins. Co.
### *As the Client Benefits...So Do You!*

**Advantages for Clients:**
➤ 28% Total Return
➤ Principle and Yield Paid Monthly
➤ 25 Month Period
➤ $10,000 Minimum
➤ High Degree of Safety
➤ Qualities for Retirement Programs
➤ Seasoned, Professional Management Team

**Advantages for You:**
➤ Excellent Compensation
➤ Short Term Returns Bring Frequent Compensation
➤ Quality Sales Materials
➤ Marketing Contracts Available



ALLIANCE LEASING

*Call* **PIONEER FINANCIAL CONCEPTS** *Today to Find Out How You Can Be the First to Start Selling This Product!*

# 800-901-9805

*For information circle no. 123*



IT'S HERE!!!   IT'S HERE!!!



# JOHN LANG
## & ASSOCIATES, INC.

P. O. Box 1308
1012 Drum ab Avenue
Brewton, AL 36427

Phone: 334-867-9580
Fax: 334-867-3643
800-899-3917
Email: jlang@net1inc.net

February 26, 1998

VIA FACSIMILE

Larry Sherman
1211 West Fifth St.
Laurel, MS 39440

Dear Larry,

You asked me to outline my due diligence process concerning the Alliance Leasing program. I hope this will aid you in reaching a good comfort level with this lucrative program.

Alliance Leasing first came to my attention early last fall when Larry Leafer contacted David Halsey, a principal of Prime Atlantic, a marketing group located in Jacksonville, FL. First, a brief background of both people. Mr. Leafer was formerly a corporation finance attorney with the Securities and Exchange Commission in the 1970's and has more recently been in private practice in the areas of corporate, securities, and finance law. Mr. Halsey has an extensive background in the field of public finance, and his expertise includes raising funds for over 75 public companies ranging from $2 million to $35 million in equity financing. He is recognized as a leader in venture capital markets.

Approximately 3 ½ years ago, Mr. Leafer had taken public a company that the principals of Alliance Leasing had owned. Therefore, he was familiar with their excellent business reputations and was well aware of a niche market the company had carved out in the area of sub-prime leasing. However, Alliance was in need of a marketing group that would be responsible for raising the funds needed in order for Alliance to reach its maximum growth potential. Prior to this time, Alliance had raised all its funds internally.

Mr. Leafer suggested that Prime Atlantic consider marketing Alliance's leasing program through its field force because he felt it would be a perfect fit. This endorsement, in itself, carried a lot of weight due to the fact that Mr. Leafer is very diligent in anything he recommends.

Continue 002

After speaking with Alliance and asking them all the probing questions, we felt it was necessary to visit the home office in San Diego to take a closer look at the Alliance operation. Those in attendance were David Halsey, Larry Leafer, and myself.

We met over a two day period with Charles Browne, CEO, Sharon Oliver, Vice President of Administration, Susan Browne, Vice-President of Marketing, and Andrew Yurcho, in-house corporate counsel. Others that joined the meeting via conference call were Jay Shestak, Chairman, and Robert Semonian, Chief Financial Officer.

Topics that were discussed and studied in-depth included the history and background of the company and principals, crunching of the leasing numbers, procedural policies, compliance issues, internal documents, and other general questions. We were all collectively impressed that the overwhelming attitude and spirit of the Alliance team was that the most important person was the individual client, and that all procedures and policies were geared to protect that client.

After returning home, I contacted several existing joint venture partners that have purchased equipment through Alliance and all responses were favorable. Others contacted were Lisa Maryatt of Wells Fargo Bank, the company's primary banker, and Ronald Wilson, the Treasurer. I also contacted the Better Business Bureau and verified that no complaints have been filed against Alliance.

Prime Atlantic met with Baker-Hostetler, one of the top ten business law firms in the United States, and received very favorable comments concerning the Alliance program. A securities opinion was written by Andrew Yurcho, Alliance corporate counsel, which detailed the reasons why this joint venture program is not a security. This letter also had input from Larry Leafer.

I researched the leasing industry and verified statistics that state that the industry default rate is only 3%. I also had discussions with individuals in the sub-prime leasing market which confirmed data I had studied concerning how profitable this industry was and how large the potential was for high returns.

In conclusion, we have been very satisfied with our relationship with Alliance. I can honestly state that I have never associated with a harder working team than those at Alliance. The honesty and integrity of the home office personnel has been confirmed in every transaction, every phone call, and every meeting.

If you have any other questions I can help answer, feel free to call me at any time.

Sincerely,

John Lang, CFP
Certified Financial Planner



750 B STREET, SUITE 1450
SAN DIEGO, CALIFORNIA 92101

PHONE: (619) 234.1381
TOLL-FREE: (888) 448.8726
FAX: (619) 234.1993

July 22, 1998

Wilma A. Mitchell
315 North Crest
Collinsville, IL 62234

Dear Mrs. Mitchell,

Alliance Leasing is pleased to inform you that your equipment lease documents are currently being processed. The following acknowledges some of the major details relating to your lease arrangement. (The amount of this placement may or may not reflect your entire purchase deposit. If this is the case, the remaining balance will be placed and you will be notified by another Acknowledgment/Consent letter.)

| | |
|---|---|
| Total Participation Amount | $38,000.00 |
| | |
| Amount Placed in Lease Below: | $34,200.00 |
| Amount of Deposit Check | $1,634.76 |
| Date Deposit Check will be Mailed | Projected Date July 31, 1998 |
| Amount of Monthly Payment | $817.38 |
| Total of Monthly Payments $817.38/Month X 23 Payments | $18,799.74 |
| Projected Date of First Monthly Payment: | September 15, 1998 |
| Amount of Balloon Payment (or total residual payment) | $29,725.50 |
| Total Payout: | $50,160.00 |

After a thorough review of all lessee candidates, an ATM company has been selected. The assigned Lease number is 9806058.

Monthly payments are made on the 15th of each month. If you have not already done so, please complete and return the enclosed Direct Deposit Form to us at your earliest convenience. Direct deposits enable you to receive your funds directly into your designated bank account on the same day in which it is transferred. Alliance encourages this type of transaction and will be happy to discuss any questions you may have regarding its process. We offer this service to you at no additional cost.

Mrs. Mitchell, Alliance Leasing is delighted to have you participate in our Program. Our organization strives to provide courteous and professional service to each and every client. Should you ever have any questions about our Program, or specifically regarding your account, we have assigned *Susan White*, to personally assist you. We have enclosed Ms. White's business card and ask that you retain it for the future.

Please sign where indicated below your consent to the above-referenced payment schedule, and return to us in the enclosed, self-addressed envelope. Again, thank you for joining the Alliance Leasing family. Our Program is strong and will serve you well.

Very truly yours,

ALLIANCE LEASING

*John L. McDonald*

John L. McDonald, President

AGREED AND CONSENTED:

By: _____

Doc: Acknowledge Ltr; slo

## A PLAN WORKSHEET

PRINCIPAL NAME   WILMA A. MITCHELL

| LEASE # | 9806058 | IRA or CASH | CASH |
|---------|---------|-------------|------|
| M/C | LANG | I/C | DIEHL |

$38,000.00   (LESS 10% IF APPLICABLE)        $34,200.00

PARTICIPATION
AMOUNT                                        INVOICE

$34,200.00   X .0239 =   $817.38

INVOICE AMOUNT                MONTHLY PAYMENT

$817.38   X2 =   $1,634.76

MONTHLY PAYMENT        DEPOSIT AMOUNT

$38,000.00   X 32% =   $12,160.00

PARTICIPATION
AMOUNT                         YIELD

$817.38   X 23 MONTHS=   $18,799.74

MONTHLY PAYMENT                24 MONTH PAYOUT

$18,799.74   PLUS   $1,634.76        EQUALS   $20,434.50

24 MONTH PAYOUT        DEPOSIT AMOUNT                TOTAL

$50,160.00   MINUS   $20,434.50        EQUALS   $29,725.50

PARTICIPATION
+ YIELD                TOTAL PAYOUT                FINAL BAL

A PLAN WORKSHEET



750 B STREET, SUITE 1450
SAN DIEGO, CALIFORNIA 92101

PHONE: (619) 234.1381
TOLL-FREE: (888) 448.8726
FAX: (619) 234.1993

July 21, 1998

Dear Wilma A. Mitchell,

I would like to take this opportunity to introduce myself to you, as a principal of Alliance Leasing. My name is Ligion Britton. I am the Manager of Financial Services for Alliance. I oversee the entire credit and leasing operations of the Equipment Purchase Program for Alliance. I have over 25 years combined experience in Accounting Credit Management. I received my Bachelor of Arts from the University of Rochester, my Masters, Business Administration from National University and has earned my CCE (Certified Credit Executive) certification from the National Association of Credit Managers ("NACM s"). I am currently an active member of CFDD Credit Group.

We are happy to present the following lessee candidate for your review and consent.

*Sovereign Financial , Keith Jeske ,CFO , offers 26 years of excellent credit history*
*Fair Isaac credit score over 700*
*25 years of experience in real estate and finance management.*

You have requested to your desire to participate in the selection of your lessee candidate. I hope the above information will satisfy any questions you might have as to this candidate's credit worthiness at this time. It is my professional opinion that this candidate meets the criteria for acceptance as a lessee for your funds.

Please indicate below your acknowledgement and consent of the above-referenced lessee candidate, and return (via facsimile number 619.234.1993) this to me within the next 24 hours.

If you have any questions, please contact me immediately at my toll free telephone 888.448.8726.

Thank you.

Very truly yours,

ALLIANCE LEASING

Ligion Britton
Manager, Financial Services

ACKNOWELDGED AND CONSENTED BY:

By: _____

Date: _____

Doc:  Lessee Candidate Letter; slo; 07/21/98

ROM : CORPORATE OFFICE                PHONE NO. : 702 320 0721          ११. 08 1998 04:48PM P7

# Summit Financial Group, LLC

1055 East Tropicana Road, Suite 525
Las Vegas, Nevada 89119
702 320-0717  Fax 702 320-0721



**The following number must appear on all related
correspondence, shipping papers, and invoices:
P.O. NUMBER: 000142**

**To:**                                              **Ship To:**

Nancy Morgan                                            See Attached
Triton Systems, Inc.
522 E. Railroad St.
Long Beach, MS 39560

| P.O. DATE | REQUISITIONER | SHIP VIA | F.O.B. POINT | TERMS |
|-----------|---------------|----------|--------------|-------|
| 7/2/98    | Cathy Ronan   |          |              |       |

| QTY | UNIT | DESCRIPTION | UNIT PRICE | TOTAL |
|-----|------|-------------|------------|-------|
| 54  |      | Triton 9600 ATMs, Color graphic/lighted top mount signs |  | $324,000 |
|     |      |             |            |       |

|  |  |
|--|--|
| SUBTOTAL | $324,000 |
| SALES TAX |  |
| SHIPPING & HANDLING | $ 18,900 |
| OTHER |  |
| **TOTAL** | **$342,900** |

1. Please send two copies of your invoice.

2. Enter this order in accordance with the prices, terms, delivery method, and
   specifications listed above.

3. Please notify us immediately if you are unable to ship as specified.

4. Send all correspondence to:
   Cathy Ronan
   Summit Financial Group, LLC
   1055 East Tropicana Avenue, Suite 525
   Las Vegas, Nevada 89119
   702 320-0717  Fax 702 320-0721

Authorized by                                          Date

# Summit Financial Group, LLC

1055East Tropicana Avenue, Suite 525
Las Vegas, Nevada 89119

Phone: 702 320-0717
Fax: 702 320-0721

## INVOICE

**Date:** June 18, 1998                  **Invoice #:** 100099

## Bill To:

Alliance Leasing
750 B Street
Suite 1450
San Diego, California 92101

| To: | Installation Location: |
|---|---|
| Sovereign Financial Corporation | See Attached |
| 750 B Street, Suite 1450 | |
| San Diego, California 92101 | |

## Equipment:

| *Quantity* | *Item Description* | *Price* |
|---|---|---|
| 54 | Triton 9600 @ $16,000 | $864,000 |
| | **TOTAL** | $864,000 |

JS 44
(Rev 07/86)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I (a) PLAINTIFFS

Raymond Nielsen

## DEFENDANTS

**FILED**

Charles Browne
Prime Atlantic, Inc.
David L. Halsey, Fracius Giovanno
Sovereign Financial Corporation
Sovereign Capital Corporation

98 NOV 25 AM 11:56

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    **King**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Ray Siderius, C.R. Lonergan, Jr.
SIDERIUS LONERGAN
500 Union St., Ste 847
Seattle, WA 98101
206/624-2800    206/624-2805 (fax)

ATTORNEYS (IF KNOWN)

'98 CV 2150 TW JAH

## II. BASIS OF JURISDICTION  (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES  (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

15:0078 SS

CLASS ACTION | SECURITIES FRAUD — VIOLATION OF UNITED STATES SECURITIES LAWS

## V. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med Malpractice | ☐ 620 Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 630 Liquor Laws | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt Relations | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 863 DIWC (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 863 DIWW (405(g)) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 Habeas Corpus | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 540 Mandamus & Other | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | | | | |

## VI. ORIGIN  (PLACE AN x IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23    Yes

DEMAND $

Check YES only if demanded in complaint:
JURY DEMAND: ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY  (See instructions)

JUDGE _____    DOCKET NUMBER _____

DATE
November 25, 1998

SIGNATURE OF ATTORNEY OF RECORD
Ray Siderius

UNITED STATES DISTRICT COURT    #150 4405 ORIGINAL